IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEVON MAURICE JOHNSON,<br><br>Petitioner,<br><br>vs.<br><br>CHRISTIAN PFEIFFER, Warden, Kern Valley State Prison,[1]<br><br>Respondent. | No. 2:17-cv-01635-JKS<br><br>MEMORANDUM DECISION |

Devon Maurice Johnson, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Johnson is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Kern Valley State Prison. Respondent has answered, and Johnson has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

Johnson was charged with second-degree robbery (Count 1), second-degree commercial burglary (Count 2), and being a felon in possession of a firearm (Count 3) in connection with a January 2013 theft at an internet café. The indictment also alleged that, as to Counts 1 and 2, that Johnson was armed with a handgun and that, as to all counts, Johnson had served three prior prison terms. Johnson pled not guilty, denied the enhancement allegations, and proceeded to a jury trial. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Johnson and the evidence presented at trial:

---

[1] Christian Pfeiffer, Warden, Kern Valley State Prison, is substituted for M. Eliot Spearman, former Warden, California Substance Abuse Treatment Facility and State Prison, Corcoran. FED. R. CIV. P. 25(c).

A. The Prosecution's Case-in-Chief

On January 12, 2013, Crystal Lee was working as a clerk at Web-Man, an internet café in Stockton. Around 11:40 p.m., Lee saw a man walk quickly or jog into an office area towards the back of the café. Lee followed the man, and watched him grab approximately $500 from the cash register. Lee asked, "What are you doing?" The man responded by pushing her into an office chair. Frightened, Lee told the man "to do whatever he wanted." The man left Lee's office. Moments later, Lee saw the man in the café, surrounded by customers. The man broke free and fled, leaving a gun and glove near the door.

During the trial, Lee testified that the robber was wearing a black hoodie, jeans and Nike shoes. The robber also wore a glove on his right hand. The robber's face and hair were covered, but Lee was able to see his forehead. Lee described the robber's complexion as dark brown. Lee, who is five feet and one inch tall, told police that the robber was five feet and eight inches. At trial, however, she estimated that the robber was closer to six feet three inches.

Max Haro was a customer at the internet café. Haro was seated at a computer terminal near the front of the store. While staring at the computer monitor, Haro saw the reflected image of a figure moving quickly towards the office area. Haro turned and saw someone go through the door leading towards the office. He heard a disturbance, and rose from his seat, positioning himself near the entrance/exit door. Haro then saw a masked man emerge from the office area, and run towards the door.

Haro testified that the man was wearing a long beanie, pulled down over his face. Although the man's face was obscured, Haro could see his eyes. Haro also testified that he could also see dark brown dreadlocks sticking out of the man's beanie.

Haro struck the man with a closed fist. The man stumbled or shuffled forward, and a gun fell to the floor from the area around his waist. The man recovered and ran out of the building. Haro picked up the gun barehanded and set it on the counter, on top of a glove that another customer had already placed there. The gun, which was taped around the handle, remained on the counter, untouched, until police arrived.

Craig Lease was another customer at the internet café. Lease saw a man come into the café and run towards the office area. Lease testified that he saw the man make contact with Lee, and then run towards the front door.

Lease testified that he could see the man's face, and that he was "black." Lease added that he was wearing a hoodie and holding a gun in his right hand. Lease could not see the man's hair.

Lease saw another customer (later identified as Haro) strike the man, who fell forward, losing his grip on the gun. The gun flew out of the man's hand, and came to rest approximately 15 feet away. The man then ran out of the café.

Stockton Police Officer James Padilla responded to the café shortly before midnight. Padilla testified that he recovered the gun and removed several rounds of live ammunition using his bare hands. The gun was a .32 caliber revolver.

Senior Criminalist Bob Cheseldine analyzed the gun for DNA. Cheseldine's analysis revealed one major contributor and two minor contributors. Most of the DNA found on the gun—93% of the sample—belonged to the major contributor. The DNA

profile for the major contributor was uploaded into a database, which returned a match to [Johnson].

Cheseldine also examined DNA on the ammunition found in the gun. Cheseldine concluded that there was not enough DNA on the ammunition to include or exclude [Johnson] as a possible contributor.

Cheseldine also examined DNA on the glove found on the floor of the café. The glove contained a mixture from at least three different contributors. The major contributor was female. There was not enough DNA from the two minor contributors to include or exclude [Johnson] as a possible contributor.

At trial, Cheseldine acknowledged that he could not tell when DNA was deposited on an object, or who touched the object last. Furthermore, Cheseldine acknowledged that DNA could be transferred from one person to another person, and then to the object. Nevertheless, Cheseldine opined that the probability that the DNA found on the gun was from another African American person was one in 700 quintillion.

Stockton Police Detective Phirun Var interviewed [Johnson] on November 4, 2013. Var testified that [Johnson] stands between five feet ten inches and six feet tall and is right-handed. Var also testified that, at the time of the interview, [Johnson] wore dreadlocks and "the tip of his hair was . . . lighter than the rest of his hair."

The interview was recorded and a redacted version played for the jury. During the redacted recording, [Johnson] acknowledged that he lived near the café at the time of the robbery. [Johnson] also acknowledged that he had previously committed robberies and had "been caught with guns." We discuss [Johnson's] statements regarding guns in greater detail below.

Despite these admissions, [Johnson] repeatedly denied having committed the robbery. Even as [Johnson] denied robbing the café, he implied that, had he intended to commit a robbery, he would not have been caught. Specifically, [Johnson] stated that he would have been careful to conceal his face and dreadlocks. According to [Johnson], "First of all, I've done robberies and I never leave my face open." When asked what he ordinarily uses to cover his face, [Johnson] replied, "Anything I can find. A sheet, a shirt, something, because this is like, these [dreadlocks] is like, real noticeable." When informed that witnesses had described the robber as having dreadlocks, [Johnson] responded that his dreadlocks were "fire red" at the time of the robbery.

[Johnson] also suggested that he could not have committed the crime because he would not have left his gun behind. When Var described the gun recovered from the crime scene as "hella crappy," [Johnson] responded, "I don't care how crappy it looked. As long as it shoots, I'm not leaving it."

When confronted with the results of the DNA analysis, [Johnson] allowed that he might have committed the crime, but forgot having done so, due to his excessive drug use. When asked to explain how his DNA came to be on the gun, [Johnson] hypothesized: "Maybe I coulda touched it. Somebody I let use it. But then, then no, 'cuz I want my gun back." When pressed, [Johnson] insisted: "I don't know. It's a good one. But I know, I don't leave guns. I pay too much for them. For real, I don't leave 'em." [Johnson] was not able to explain how his DNA came to be on the gun.

B. [Johnson's] Motion in Limine

Out of the presence of the jury, [Johnson] moved to exclude portions of the recorded interview, including a conversation with Var concerning his prior possession of revolvers. The transcript of the unredacted recording includes the following exchange:

"[VAR]: Do you own any guns?

"[JOHNSON]: Do I have any guns?

"[VAR]: Yeah.

"[JOHNSON]: No. I've been caught with guns. That's my M.O. I get caught with guns.

"[VAR]: Yeah, I read a little bit—

"[JOHNSON]: Yeah.

"[VAR]: A little bit about you. So, what kind of guns do you usually carry? Or do you usually get caught with?

"[JOHNSON]: Revolvers.

"[VAR]: Revolvers?

"[JOHNSON]: Yeah.

"[VAR]: Okay. What was the last revolver you had?

"[JOHNSON]: A .38? No, uh, .357.

"[VAR]: A .357?

"[JOHNSON]: I got caught with that.

"[VAR]: When was this?

"[JOHNSON]: I don't know when it was, but that's the last gun I been caught with.

"[VAR]: Was this this year? Last year?

"[JOHNSON]: I can't remember, but it wasn't this year. I don't think it was last year.

"[VAR]: How many times you been—

“[JOHNSON]: I been caught with, like, 3, 4 guns.

“[VAR]: 3 or 4 guns? And you’re—you normally like to carry revolvers?

“[JOHNSON]: Yeah.

“[VAR]: Why is that?

“[JOHNSON]: I don’t know. I just like revolvers.

“[VAR]: Okay. Cowboy style?

“[JOHNSON]: Yeah. I just like revolvers.

“[VAR]: Do you have any other type of guns? Besides the .357?

“[JOHNSON]: That I’ve been caught with?

“[VAR]: That you’ve been caught with, that you own, or you had for a short period of time . . .

“[JOHNSON]: I’ve had a mac.

“[VAR]: A mac?

“[JOHNSON]: A Mac 11.

“[VAR]: A Mac 11?

“[JOHNSON]: Yeah.

“[VAR]: Okay. What else?

“[JOHNSON]: That’s about it.

“[VAR]: Any other type of revolvers?

“[JOHNSON]: I’ve had a Glock. A Glock 40. That’s about it for guns.

“[VAR]: And those are the only three guns you been caught with?
“[JOHNSON]: Yeah.

“[VAR]: You got caught with a Mac 11?

"[JOHNSON]: Yeah."

[Johnson] moved to exclude the entire conversation concerning his prior possession of guns. The prosecutor agreed that [Johnson's] statements concerning his prior possession of a Mac 11 and Glock 40 should not be admitted. However, the prosecutor argued that [Johnson's] statements concerning his preference for and prior possession of revolvers was relevant to establish [Johnson's] identity as the perpetrator of the charged crimes. The trial court admitted [Johnson's] statements concerning his preference for and prior possession of revolvers. [Johnson's] statements concerning his prior possession of a Mac 11 and Glock 40 were redacted from the recording played for the jury.

C. [Johnson's] Motion to Acquit

At the end of the prosecution's case-in-chief, [Johnson] moved for a judgment of acquittal under section 1118.1, challenging the sufficiency of the evidence as to his identity as the robber.[FN2] Specifically, [Johnson] argued that the DNA evidence failed to place him at the scene, as there was no way to determine when defendant might have handled the gun. Furthermore, [Johnson] argued, none of the eye witnesses were able to provide a sufficiently detailed physical description of the man they saw. The trial court denied the motion.

FN2. Defense counsel referred to "1118;" however, the parties agree that the motion to acquit was made pursuant to section 1118.1.

D. Defense Case

The defense presented a stipulated expert statement. The defense expert's conclusions were substantially the same as Cheseldine's. However, the defense expert also opined, "It is possible that the last individual contacting the handgun is one of the minor contributors." Furthermore, the defense expert opined that the DNA found on the ammunition, while not enough to include or exclude [Johnson] as a possible contributor, was consistent with [Johnson's] DNA profile.

*People v. Johnson*, No. C078781, 2016 WL 5224376, at *1-4 (Cal. Ct. App. Sept. 22, 2016).

At the conclusion of trial, the jury found Johnson guilty as charged and also found true the allegation that Johnson was armed with a firearm during the commission of the second-degree robbery (Count 1). After the jury was excused, Johnson waived his right to a jury trial on the prior prison term allegations.

When the parties appeared for the court trial on the prison prior allegations and sentencing, defense counsel confirmed that Johnson was prepared to admit the three prison priors and the following colloquy took place:

> "THE COURT: Okay. [Johnson], you're admitting the three prior prison terms that are charged on the information?
>
> "[JOHNSON]: Yeah.
>
> "THE COURT: Okay. And you understand you have a right to have a trial on those?
>
> "[JOHNSON]: Yeah.
>
> "THE COURT: And I believe you previously waived the right to jury trial, but you have a right to a court trial on those. [¶] And you are going to [forego] that right, is that correct—
>
> "[JOHNSON]: Yeah.
>
> "THE COURT: —and admit the violation with the understandings that with each prison prior, it's an additional one-year term?
>
> "[JOHNSON]: Yeah.
>
> "THE COURT: Okay."

The Court then sentenced Johnson to a term of 8 years' imprisonment.

Through counsel, Johnson appealed his conviction, arguing that: 1) the trial court erred in denying Johnson's motion to acquit based on insufficient evidence of identity presented during the prosecution's case in chief; 2) when considering the totality of the evidence presented at trial, the prosecution failed to establish Johnson's identity as the perpetrator of the crimes beyond a reasonable doubt; 3) the trial court erred in admitting Johnson's statement that he had "been caught with" guns in the past; and 4) the trial court failed to properly advise Johnson of his rights to confront witnesses and to not incriminate himself thus invalidating his admission of the three

prior prison term allegations. The Court of Appeal unanimously affirmed the judgment against Johnson in a reasoned, unpublished decision issued on September 22, 2016. *Johnson*, 2016 WL 5224376, at *12. Johnson petitioned for review in the California Supreme Court, which was summarily denied on December 14, 2016.

Johnson timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court dated July 30, 2017. Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Johnson raises the following claims: 1) the evidence presented to establish Johnson's identity was constitutionally insufficient; 2) Johnson's "vague statements [that] he had 'done robberies' while covering his face . . . did nothing to tip the balance in favor of prosecution and their case;" 3) "[e]vidence of [Johnson's] style of dread locks at the time of events in this case did nothing for prosecution's case;" 4) "[t]he fact that [Johnson] has a like for revolvers and occasionally possessed them in th past does not link him to this robbery;" 5) the fact that he is a black male "does not substantiate evidence that he committed the crime;" and 6) the lack of a proper advisement as to his confrontation rights and the right against self-incrimination invalidates his admission to the three prior prison term allegations.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). The term unreasonable is a common term in the legal world. The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

### A. *Insufficiency of the Evidence* (Grounds 1-5)

Johnson first raises various claims challenging the sufficiency of the evidence identifying him as the perpetrator of the crimes.[2] As articulated by the Supreme Court in *Jackson*, the

[2] In support of Ground 2, which alleges that his admitted statements were insufficient to establish his identity as the perpetrator, Johnson cursorily states that his "vague statements" that he had previously committed masked robberies "lack probative value." To the extent that his *pro se* petition may be liberally construed pursuant to *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), to re-allege his direct appeal claim challenging the admission of those statements, Johnson is not entitled to relief on such evidentiary error claim. "Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987). Johnson's challenge to the trial court's evidentiary ruling raises no federal question because

federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the

---

"alleged errors in the application of state law are not cognizable in federal habeas corpus." *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996); *see also Estelle*, 502 U.S. at 67-68; *Cooper v. Brown*, 510 F.3d 870, 1001 (9th Cir. 2007) (claim of evidentiary error "fails to present a federal question cognizable on federal habeas review").

state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id*. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

The Court of Appeal considered and rejected Johnson's insufficiency of the evidence claims on direct appeal as follows:

> [Johnson] contends that no substantial evidence placed him at the café on the night of the burglary and robbery. We are not convinced. "'Apropos the question of identity, to entitle a reviewing court to set aside a jury's finding of guilt the evidence of identity must be so weak as to constitute practically no evidence at all.' [Citations.]" (*People v. Mohamed* (2011) 201 Cal.App.4th 515, 521.) We cannot say, on the record

before us, that the evidence of identity at the close of the prosecution's case-in-chief was "so weak as to constitute practically no evidence at all." (*Ibid*.)

At the close of the prosecution's case-in-chief, the evidence showed that [Johnson] matched the eyewitnesses' general description of an African American man wearing dreadlocks, lived near the café at the time of the robbery, admitted to previously committing robberies while concealing his face, and was the major contributor of DNA found on the gun dropped by the perpetrator. Based on the foregoing, a reasonable jury could conclude that [Johnson] was the perpetrator of the charged crimes.

[Johnson] challenges the sufficiency of the prosecution's evidence of identity, arguing that none of the eyewitnesses identified [Johnson] as the perpetrator. Although none of the eyewitnesses saw the perpetrator's face, they nevertheless offered substantial evidence of identity. All of the eyewitnesses testified that the perpetrator was male. Two eyewitnesses—Lee and Lease—testified that the perpetrator had "dark brown" and "black" skin. Lee also testified that the perpetrator was approximately the same height as [Johnson]. And one of the eyewitnesses—Haro—testified that the perpetrator wore dreadlocks, the same hairstyle as [Johnson]. The other witnesses could not see [Johnson's] hair.

"Our courts have held that it is not necessary that any of the witnesses called to identify the accused should have seen his face. [Citation.] Identification based on other peculiarities may be reasonably sure. Consequently, the identity of a defendant may be established by proof of any peculiarities of size, appearance, similarity of voice, features or clothing." (*People v. Lindsay* (1964) 227 Cal. App. 2d 482, 494; *see also People v. James* (1963) 218 Cal. App. 2d 166, 170 [evidence of identification sufficient even though robber's face was covered by mask, where witnesses identified him based on his Scottish accent, peculiar walk, clothing, and general appearance].) Here, though none of the eyewitnesses saw the perpetrator's face, they identified other "peculiarities," such as the perpetrator's dreadlocks, which were sufficiently distinctive that the perpetrator made an effort to conceal them.

The fact that Haro was the only eyewitness to see the perpetrator's dreadlocks does not establish a lack of substantial evidence. "The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) There was nothing in the record at the close of the prosecution's case-in-chief (or at any time) to suggest that Haro's testimony was physically impossible or inherently improbable.

[Johnson] argues that Haro's description of the perpetrator was inconsistent with his actual appearance at the time of the crimes. Specifically, [Johnson] argues that Haro's testimony failed to establish his identity as the perpetrator because Haro testified that the perpetrator's dreadlocks were "dark brown," and [Johnson's] dreadlocks were "fire red." Significantly, the only evidence concerning [Johnson's] appearance at the time of the crimes at the close of the prosecution's case-in-chief (or at any time) was [Johnson's] own account to police some ten months later. We reiterate that [Johnson] did not mention the color of his dreadlocks until after he was told that the robber wore dreadlocks. On this record, a jury could reasonably reject [Johnson's] account of his

appearance, and conclude that his description of his dreadlocks as "fire red" was merely an attempt to deflect suspicion.

In any case, [Johnson's] self-description, which was explored at length during the prosecution's case-in-chief, does not render Haro's testimony physically impossible or inherently improbable. (*In re Gustavo M.* (1989) 214 Cal. App. 3d 1485, 1497 ["when the circumstances surrounding the identification and its weight are explored at length at trial, [and] where eyewitness identification is believed by the trier of fact, that determination is binding on the reviewing court"].) Furthermore, any discrepancies in the identification of the perpetrator would not establish a lack of substantial evidence. "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.) "Weaknesses and inconsistencies in eyewitness testimony are matters solely for the jury to evaluate." (*People v. Allen* (1985) 165 Cal.App.3d 616, 623; *accord, People v. Echevarria* (1992) 11 Cal. App. 4th 444, 453; *see People v. Hill* (1998) 17 Cal.4th 800, 849 [inconsistencies in identification of defendant, who was five feet ten inches tall, where one eyewitness told police perpetrator was five feet four inches to five feet five inches tall, and another eyewitness testified that defendant was definitely not the perpetrator, were "merely discrepancies in the evidence the jury considered and resolved against defendant"].)

Even setting aside the eyewitness identifications, the prosecution presented substantial evidence establishing [Johnson's] identity as the perpetrator. The prosecution's DNA expert, Cheseldine, testified that [Johnson] was the major contributor of the DNA found on the gun. Although [Johnson] observes that the DNA could have been placed on the gun before the crimes were committed, a jury could reasonably reject this hypothesis, as [Johnson] himself appeared to do, when he told Var, "Maybe I coulda touched [the gun]. Somebody I let use it. *But then, then no, 'cuz I want my gun back.*" (Italics added.)

[Johnson] also observes that "the firearm contained DNA from two other people; indicating that other possible perpetrators had touched it." "The existence of possible exculpatory explanations, whether they are simply suggestions not excluded by the evidence or even where they could be reasonably deduced from the evidence, could not justify this court's rejecting the determination of the trier of fact that [Johnson] is guilty unless on appeal it 'be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in [trial court.]'" (*People v. Redrick* (1961) 55 Cal.2d 282, 290.) Here, though Cheseldine's testimony could be reconciled with a finding that "other possible perpetrators" touched the gun, the evidence at the close of the prosecution's case-in-chief could also reasonably justify a finding that the gun belonged to [Johnson] , the major contributor responsible for 93% of the DNA sample. On the record before us, at the time of the motion to acquit, the jury could reasonably conclude that Haro and Padilla, each of whom handled the gun barehanded, were responsible for the remaining 7% of the DNA sample.

[Johnson] observes that DNA could have been transferred onto the gun by someone else. While there may be plausible alternate explanations for how [Johnson's] DNA came to be on the gun, there was no evidence supporting such a scenario at the close of the prosecution's case-in-chief (or at any time), and, even if there were, the existence of such an explanation would not establish a lack of substantial evidence. (*Redrick, supra*, 55 Cal.2d at p. 290.) Thus, though [Johnson's] DNA could have been transferred to the gun by another person, the jury could reasonably accept the more obvious, and more likely, scenario that [Johnson] dropped the gun during the commission of the crime.

[Johnson] also observes that the DNA recovered from the ammunition found in the gun was inconclusive, and the major contributor to the DNA recovered from the glove was female. Once again, however, the existence of circumstances that might reasonably be reconciled with a finding of innocence does not render the evidence insubstantial. (*People v. Earp* (1999) 20 Cal.4th 826, 887-888.) It was the exclusive province of the jury to weigh the evidence of [Johnson's] DNA on the gun, which was conclusive, against the inconclusive evidence of [Johnson's] DNA on the ammunition and glove. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) It was also up to the jury to consider the possibility that the perpetrator may have been a woman. At the close of the prosecution's case-in-chief, a reasonable jury could conclude that [Johnson] used the gun in the commission of the crime, despite the prosecution's inability to show that [Johnson] handled the ammunition or glove.

Finally, [Johnson] argues that his admissions to Var do not establish his identity as the perpetrator. Specifically, [Johnson] argues that many robbers cover their faces and "[r]evolvers are a common type of firearm." These arguments amount to an invitation to reweigh the evidence, which we cannot do. As we have already established, the record shows substantial evidence presented during the prosecution's case-in-chief from which a jury could find beyond a reasonable doubt that defendant was the perpetrator of the crimes. The trial court properly denied [Johnson's] motion for acquittal.

. . . .

Next, [Johnson] contends that, even considering [Johnson's] evidence, the prosecution failed to establish his identity as the perpetrator of the crimes beyond a reasonable doubt. Just as we have found the evidence of [Johnson's] identity sufficient at the close of the prosecution's case-in-chief, we also find there is sufficient evidence to support the conviction when reviewing the record as a whole.

As noted, the defense presented a stipulated expert statement expressing substantially the same conclusions as Cheseldine. Like Cheseldine, the defense expert concluded that [Johnson] was the major contributor of the DNA found on the gun. The defense expert also concluded that the DNA found on the ammunition, while not enough to include or exclude [Johnson] as a possible contributor, was consistent with [Johnson's] DNA profile.

As previously discussed, the prosecution presented substantial evidence from which a jury could find beyond a reasonable doubt that [Johnson] was the perpetrator of the crimes. The defense case consisted of the stipulated expert statement, which, as [Johnson] acknowledges, was largely consistent with Cheseldine's testimony. Because

> the prosecution's case-in-chief presented substantial evidence of identity, and because the defense case was, for the most part, a recapitulation of the prosecution's DNA evidence, we conclude that there was substantial evidence of identity on the record as a whole. The defense expert's opinion that the DNA found on the ammunition, though inconclusive, was consistent with [Johnson's] DNA profile, does nothing to alter our conclusion. To the contrary, the jury could have reasonably concluded that the DNA found on the ammunition, though inconclusive, was consistent with [Johnson's] use of the gun in the commission of the crime. Viewing the entire record in the light most favorable to the judgment, we conclude that substantial evidence supports the convictions.

*Johnson*, 2016 WL 5224376, at *5-8.

The Court of Appeal's holding is both reasonable and fully supported by the record. Johnson argues in his Petition, as he did on direct appeal, that the evidence did not conclusively establish that he was the perpetrator of the crimes. In support of his claim, Johnson again points to weaknesses in the prosecution's case and inconsistencies presented at trial. But all of the evidence in support of his claim was before the jury for its assessment. This Court is precluded from re-weighing the evidence or re-assessing witness credibility. *Schlup*, 513 U.S at 330; *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004). It is also well-settled under federal law, like California law, that the testimony of even a single witness is sufficient to support a conviction under the *Jackson* standard. *See, e.g.*, *Bruce*, 376 F.3d at 957-58 (testimony of single witness sufficient to uphold conviction under Jackson); *United States v. McClendon*, 782 F.2d 785, 790 (9th Cir. 1986). Furthermore, "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation and internal quotation marks omitted); *see also Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000) (evidence may be found sufficient to support conviction even where it "was almost entirely circumstantial and relatively weak," and fact that reviewing court may have reached different result or have reasonable doubt not enough to overcome *Jackson's* "high standard").

Although it might have been possible to draw a different inference from other evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. Johnson bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous. 28 U.S.C. § 2254(e)(1). He has failed to carry such burden. For the reasons persuasively stated by the Court of Appeal, the record does not compel the conclusion that no rational trier of fact could have found that Johnson was the individual in question, especially considering the double deference owed under Jackson and AEDPA. *See Valdez v. Clark*, 587 F. App'x 414, 414-25 (9th Cir. 2014). Johnson is therefore not entitled to relief on any of his legal insufficiency claims.

B. *Invalidation of Admission of Prison Priors* (Ground 6)

Johnson additionally argues that, because he was not specifically advised of his rights to remain silent and to confront witnesses, his admission of the three prior prison terms is invalid. The Court of Appeal rejected Johnson's claim, concluding that, "[a]lthough the trial court failed to fully advise [Johnson] of his rights, the totality of the circumstances demonstrates that [Johnson's] admission of the prior prison term allegations was voluntary and intelligent."

Johnson fares no better on federal habeas review. In *Apprendi v. New Jersey*, the U.S. Supreme Court held that "*[o]ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 190 (2000) (emphasis added). In this case, however, the sentencing court relied only on the prior convictions, which does not offend *Apprendi*. Where "only the existence of a prior conviction is at issue," a petitioner "has no federal right to have a jury decide that question." *Davis v. Woodford*, 446 F.3d 957, 963 (9th

Cir. 2006). Because Johnson did not have a federal right to a jury trial on the prison prior allegations, he is not entitled to federal habeas relief on the trial court's failure to advise him of his rights to remain silent and cross-examine witnesses. Such claim presents only a state law issue, and this Court is bound by the Court of Appeals' determination that Johnson's admission was knowing and voluntary. *See Bradshaw*, 546 U.S. at 76 (on federal habeas review, court is bound by the state court's interpretation of state law). Johnson is thus not entitled to relief on this claim either.

V. CONCLUSION AND ORDER

Johnson is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 4, 2019.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge